UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | Crim. No. 23-CR-188 (CRC) |
| | : | |
| v. | : | |
| | : | |
| **ALEXANDER HAMILTON,** | : | |
| | : | |
| Defendant. | : | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Memorandum in Aid of Sentencing. For the reasons herein, the United States requests that the Court sentence the Defendant to a period of **36 months** of incarceration. Specifically, the government seeks 6 months of incarceration for the violation of 18 U.S.C. § 402, to run concurrent to a sentence of 36 months of incarceration for the violation of 22 D.C. Code § 722. The Government further requests that the Court impose a period of **five years** of supervised release.[1]

### BACKGROUND

"The grand jury has always occupied a high place as an instrument of justice in our system of criminal law—so much so that it is enshrined in the Constitution." *United States v. Sells Engineering, Inc.*, 463 U.S. 418, 423 (1983).

> [The Supreme Court] consistently [has] recognized that the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings. In particular, [the Court has] noted several distinct interests served by safeguarding the confidentiality of grand jury proceedings. First, if preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that

---

[1] D.C. law requires five years of Supervised Release if the Court sentences the defendant to greater than one year incarceration on the violation of 22 D.C. Code § 722. *See* 24 D.C. Code § 403.01(b)(2)(A).

> testimony. Moreover, witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution as well as to inducements. There also would be the risk that those about to be indicted would flee, or would try to influence individual grand jurors to vote against indictment. Finally, by preserving the secrecy of the proceedings, we assure that persons who are accused but exonerated by the grand jury will not be held up to public ridicule.

*Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 218–19 (1979) (footnotes and citation omitted). Grand jury secrecy is "as important for the protection of the innocent as for the pursuit of the guilty." *United States v. Johnson*, 319 U.S. 503, 513 (1983).

In 1970, Congress established the Superior Court of the District of Columbia ("Superior Court") as the trial court of general jurisdiction for Washington, D.C. The Criminal Division for Superior Court is responsible for hearing all local criminal matters—*i.e.,* violations of the D.C. Code. Just as in District Court, felony criminal cases are presented to a grand jury of 16 to 23 members of the community. *Compare* D.C. Crim. R. 6(a), *with* Fed. R. Crim. P. 6(a). The procedural rules governing grand juries and grand jury secrecy are virtually identical in federal and Superior Court. *Compare* D.C. Crim. R. 6, 6(e), *with* Fed. R. Crim. P. 6, 6(e). Superior Court grand juries are charged with hearing and considering charges on cases ranging from low-level felonies to the most serious violent crimes in the District, including homicide and first degree sexual abuse cases.

In 2022, there were 203 homicides in the District of Columbia, compared to 88 ten years earlier in 2012. *Homicide Closure Rates*, https://mpdc.dc.gov/page/homicide-closure-rates (last visited Jan. 1, 2024). In 2023, there were 272 homicides. *District Crime Data at a Glance*, https://mpdc.dc.gov/page/district-crime-data-glance (last visited Jan. 1, 2024). The homicide closure rate in 2022 was 62%. *Homicide Closure Rates*, https://mpdc.dc.gov/page/homicide-closure-rates (last visited Jan. 1, 2024).

## FACTUAL AND PROCEEDURAL HISTORY

On September 9, 2022, Mr. Hamilton was sworn in as a grand juror on a Superior Court grand jury scheduled to sit until October 14, 2022. From the moment his service began, Mr. Hamilton publicly expressed an intention to disregard his duties and undermine the process. At the empanelment of the grand jury, the Acting Chief Judge charged the grand jurors, including Mr. Hamilton, with keeping the proceedings secret from their family, friends, or any other members of the public. Mr. Hamilton was required to take an oath stating that he would keep the proceedings secret. However, as Mr. Hamilton raised one hand to take the oath, he filmed himself using his cell phone in the other hand, looked down at the phone, and stated, "I'm about to lie." Ex. 1. He then sent that video to various people via text message.

While the swearing in of Mr. Hamilton took place at Superior Court, the grand jury sits in a suite at the United States Attorney's Office. Mr. Hamilton was both verbally instructed, and given written materials explaining, that cell phones were not permitted in the grand jury rooms.

**GRAND JURY FAQs** (revised April 2022)

Q. Are cell phones permitted? How about a laptop computer or tablet?
A. The US Attorneys' Office (USAO) allows grand jurors to take cell phones and other electronic devices such as small laptops, e-readers, tablets etc., into the lobby of the building, but they must be stored in lockers at the security desk. Jurors are allowed access to their devices during the lunch hour and scheduled breaks in the lobby area or outside the building.

**Figure 1**

Additionally, each day that Mr. Hamilton sat as a grand juror, he was required to walk through security. He was instructed by Court Security Officers to place any electronics in a locker in the lobby of the U.S. Attorney's Office.

Despite these warnings, Mr. Hamilton covertly carried his phone into the grand jury room on September 27, 29, 30, as well as October 3, 4, 5, 6, 7, 11, and 12. On September 27 and 29, as well as October 3, 4, 5, 6, 7, 11, and 12, Mr. Hamilton used his phone to film grand jury witness testimony and presentations from prosecutors.

Mr. Hamilton subsequently transmitted and published these videos to associates and the public in numerous ways. Some videos he would send via text message to individuals or group chats. For example, on October 6, 2023, Mr. Hamilton sent a video of a shooting victim's testimony to a group chat including three other people. At one point in the video, the victim-witness's face is visible from afar. Mr. Hamilton, narrating the video, audibly describes the victim-witness as a "rat" or a "vicious rat" at various times in the video. *See* Sealed Ex. 2

Mr. Hamilton shared other videos of grand jury testimony via Instagram. Mr. Hamilton was a prolific Instagram user. His profile, "moefromthezzz," was open to the public and had more than 10,000 followers.



**Figure 2**

Mr. Hamilton had multiple methods of sharing the videos via Instagram. Some videos he would share via Instagram Stories. Instagram Stories is a feature that allows users to take photos and videos, which are placed in a slideshow that is accessible for a 24-hour period to a user's followers or the public—depending on the user's privacy settings. Because Mr. Hamilton had a public profile, any of his 10,000+ followers or any member of the public could view his Instagram Stories. Mr. Hamilton would often overlay his Instagram stories with rat emojis, suggesting

contempt for the witnesses.



**Figure 3**

He would also post stories, commenting on his experience generally and continuously showing a disdain for any individuals who would testify before a grand jury.

   

         **Figure 4**                     **Figure 5**

> Sometimes you have to give out false information... Just to see who talks too much 😂
>
> @moefromthezz

**Figure 6**

In one Instagram Story, Mr. Hamilton filmed a witness being confronted with jail calls they made to the target of an investigation. Mr. Hamilton overlayed the story with text suggesting that his followers should not speak substantively on the phones at the jail. *See* Sealed Ex. 3.

Finally, Mr. Hamilton also broadcasted live grand jury testimony via Instagram Live. Instagram Live is a function that allows users to record and share videos in real time. When an individual starts a live recording, it notifies some, if not all, of an individual's followers so that the followers know to tune in. Unlike Instagram Stories, which are relatively short clips, an Instagram user can broadcast on Instagram Live for up to four hours. And Mr. Hamilton took advantage of this service by filming and broadcasting continuously for, on occasion, more than twenty minutes of presentation to the grand jury. On multiple occasions, Mr. Hamilton filmed the portion of testimony where the witness stated their name and spelled it letter by letter for the court reporter—revealing the identity of the witness to his followers.

In some instances, Mr. Hamilton engaged in a live chat with followers about the testimony while he filmed. For example, Mr. Hamilton filmed 26 minutes of a grand jury presentation in a cold case homicide. A description of the crime, the name of the target, the name of the civilian witness, and the status of the investigation are all included in the recording. Mr. Hamilton provided a live commentary, engaging in a back-and-forth with his followers where he explained that he

6

was filming a cold case and explained who the witness was in relation to the target of the investigation.

In another homicide investigation, Mr. Hamilton filmed 25 minutes of testimony. At different times in the video, he zoomed in on evidence that was presented on the screen. During the broadcast, Mr. Hamilton had a conversation with followers, excerpted and condensed below, where he calls the witness a rat and states that the witness is the one who should be considered "guilty." He suggests that the other grand jurors are "hot" too and may reveal that he has his phone in the grand jury room. In response, other followers on Instagram call the witness a "snitch" or "hot." One follower makes a veiled threat, saying "he telling it all he a done deal," while another follower says "somebody needa slap the [expletive] out folks."

| User | Text |
|---|---|
| Mr. Hamilton | This his man rattin |
| Follower 1 | Man he a snitch |
| Follower 2 | That [expletive] hot es [expletive] |
| Follower 3 | He a mf snitch |
| Follower 1 | Aye Moe yu bet not say he guilty |
| Mr. Hamilton | Rattin on hisself he guilty keep all the rats |
| Follower 2 | We're he from |
| Follower 2 | Flaming hot [expletive] |
| Follower 2 | Let me see him creep |
| Follower 4 | He telling it all he a done deal |
| Mr. Hamilton | These other people hot to they goin tell I got my phone |
| Follower 4 | @moefromthezzz you better hide it |
| Follower 4 | He telling on [expletives] |
| Follower 5 | Aww man yeah he snitching |
| Follower 5 | They even pulled up the cash app transfers on the big screen |
| Follower 4 | He giving up names text cashapp smh |
| Mr. Hamilton | These [expletive] be TELLIN |
| Follower 6 | Somebody needa slap the [expletive] out folks |

Throughout this entire course of egregious conduct, Mr. Hamilton not only knew that he was breaking the rules of grand jury secrecy, and thus was breaking the law, he bragged about it.

7

On September 29, 2022, Mr. Hamilton sent Instagram messages stating, "I'm in jury duty listening to these rats . . . snuck my phone back here." Similarly, on October 11, 2022, Mr. Hamilton sent messages stating, "They can lock you up for this . . . Having your phone back here." And on at least three occasions, Mr. Hamilton referenced receiving at least three years of incarceration for bringing his phone into the grand jury room and recording testimony.

```
              Id  17877245123753923
    Date Created  2022-09-30 15:26:13 UTC
          Status  ACTIVE
            Text  Starting 3 years bringin your phone back here ▯▯▯▯
   Media Content  2938793667947482065
              Id
     Media Owner  ▯▯▯▯▯ (1791575000)
```

**Figure 6**

```
              Id  17924160026575078
    Date Created  2022-09-30 15:40:54 UTC
          Status  ACTIVE
            Text  Starting off 3 years bringing your phone in here ▯▯▯▯▯▯♂
   Media Content  2938801101738963399
              Id
     Media Owner  ▯▯▯▯▯ (1791575000)
```

**Figure 7**

```
              Id  17959975493054758
    Date Created  2022-10-03 14:37:29 UTC
          Status  ACTIVE
            Text  Get a easy 3 years bringin your phone back here ▯▯▯▯
   Media Content  2940940981256486881
              Id
     Media Owner  ▯▯▯▯▯ (1791575000)
```

**Figure 8**

Mr. Hamilton's grand jury service ended on October 13, 2022, after an MPD officer monitoring public Instagram accounts saw one of Mr. Hamilton's Instagram Stories and recognized the grand jury room. However, at that point, the damage was done. Mr. Hamilton's service was scheduled to end on October 14, 2022—the next day.

Mr. Hamilton was charged by complaint on November 15, 2022. On August 29, 2023, Mr.

Hamilton pleaded guilty to two charges: (1) Contempt, in violation of 18 U.S.C. § 402; and (2) Obstruction of Justice, in violation of 22 D.C. Code § 722.

## DISCUSSION AND RECOMMENDATION

### I.     Generally Applicable Legal Principles

Both federal and D.C. law recognize that in imposing a sentence, the Court should impose a sentence that reflects the seriousness of the offense, provides for just punishment for the criminal wrongdoing, and provides adequate deterrence for wrongdoing. *See* 18 U.S.C. § 3553(a)(2)(A-B); 24 D.C. Code § 403.01(a)(1-2). Deterrence includes not only specific deterrence of the defendant from committing future crimes, but also general deterrence of others in the community from committing similar crimes. *See*, *e.g.*, *United States v. McQueen*, 727 F.3d 1144, 1158 (11th Cir. 2013) ("Plainly, general deterrence is one of the key purposes of sentencing"). "The premise is that by confining offenders in a facility where they are isolated from the rest of society, a condition that most people presumably find undesirable, they and others will be deterred from committing additional crimes." *Pell v. Procunier*, 417 U.S. 817, 822 (1974).

### II.    Defendant's Sentencing Guidelines Calculation

Here, whether the federal sentencing guidelines apply to Count 1 depends on the Court's determination of the maximum penalty for Mr. Hamilton's violation of 18 U.S.C. § 402. If the six-month imprisonment cap applies to Mr. Hamilton's case, then the offense is a Class B misdemeanor and the guidelines do not apply. *See* U.S.S.G. § 1B1.9. Despite probation's reading of the statute, the government contends, and caselaw supports, that no such cap applies in this case.

The second paragraph of 18 U.S.C. § 402 caps the fine that can be paid to the United States at $1,000, and imprisonment at six months' incarceration. It also states that "this section" does not apply to contempts "committed in the presence of the court, or so near thereto as to obstruct the

administration of justice" or to those in which the "disobedience" occurred in a lawsuit "brought or prosecuted in the name of, or on behalf of the United States." It is the government's position that the phrase "this section" applies to modify the paragraph immediately preceding it. Thus, it would exclude from the six-month sentencing cap contempt activity that obstructs the administration of justice in a proceeding where the United States is a party, such as a Superior Court grand jury proceeding.

The caselaw and legislation support this interpretation. This statute was originally codified via the Clayton Act and placed in Title 28. The Act itself contained several sections. Section 21 tracked the language of the first part of the current 18 U.S.C. § 402, criminalizing contempts that also violate State law. Section 22 provided for trial by the court, or, upon demand of the accused, by a jury, akin to the current language found in 18 U.S.C. § 3691. If found guilty, punishment was to be either by fine or imprisonment or both, in the discretion of the court, "but in no case shall the fine to be paid to the United States exceed, in case the accused is a natural person, the sum of $1,000, nor shall such imprisonment exceed the term of six months." Section 24, provided that "nothing herein contained . . . shall be construed to relate to contempts committed in disobedience of any lawful decree entered in any suit or action brought or prosecuted in the name of, or on behalf of, the United States." In 1948, Section 21 of the Clayton Act (then codified as 28 U.S.C. § 386), was consolidated with Sections 1, 22, and 24, and moved into Title 18. According to the legislative history, the consolidation was not meant to change the statute's meaning or substance.

The Supreme Court considered the relationship between Sections 21, 22 and 24 in *Hill v. United States*, 300 U.S. 105 (1937). In *Hill*, the defendant was convicted of criminal contempt for violating a decree entered in an equity proceeding brought by the United States under the Sherman Antitrust Act (15 U.S.C. § 1). On appeal was the validity of his sentence, which was more than six

months. Applying Section 22, the Third Circuit found that the defendant's sentence should have been capped at six months. *Hill v. U S ex rel Weiner*, 84 F.2d 27, 28 (3d Cir. 1936).

The Supreme Court rejected the Third Circuit's application of Section 22 to limit the defendant's sentence, reasoning that the "the object of section 24 clearly was to limit the application of the provisions of section 22, and the other sections named, to prosecutions for contempt arising out of cases instituted by private litigants." *Hill*, 300 U.S. at 108 (1937).

Here, because the underlying proceeding is a Grand Jury proceeding to which the United States is a party, the six-month cap and $1,000 fine should not apply. There is therefore no statutory maximum, and the maximum fine is $250,000—the same way contempt is treated in 18 U.S.C. § 401. *See, e.g.*, *United States v. Wright*, 812 F.3d 27, 35 (1st Cir. 2016) (noting that criminal contempt under 18 U.S.C. § 401 has no statutory maximum). The sentencing guidelines should apply.[2]

### A. Defendant's Criminal History Category

The defendant has no prior criminal convictions. He therefore has no criminal history points under the federal Sentencing Guidelines, and he has zero criminal history points under the D.C. Voluntary Sentencing Guidelines.

### B. Total Offense Level

As to Count 1, the parties agreed in the plea agreement that the proper base offense level is 14, pursuant to U.S.S.G. §§ 2J1.1, 2X5.1, 2J1.2. Since the plea agreement was entered, the sentencing guidelines were amended and there is now an adjustment of two levels under U.S.S.G. § 4C1.1 for "zero-point offenders." The government believes this adjustment applies to Mr. Hamilton, bringing the offense level to 12. Additionally, because Mr. Hamilton accepted

---

[2] In *United States v. Garris*, 20-CR-140 (CJN), Judge Nichols agreed with the government's position. A portion of the transcript from the sentencing in that case is attached as Exhibit 4.

responsibility, a further 2-level reduction is appropriate. U.S.S.G. § 3E1.1. The total offense level is therefore 10, and the guidelines range on Count 1 is 6-12 months.

For Count 2, the D.C. Voluntary Sentencing Guidelines apply. Obstruction of Justice under 22 D.C. Code § 722 is a Group 5 level offense. Because Mr. Hamilton has zero criminal history points, the guidelines are 36 to 84 months. The offense also carries a statutory minimum of 36 months, meaning that 36 months must be imposed but that some or all of the sentence can be suspended. *See* DCVSG § 3.5.

### III.   Sentencing Recommendation

When determining the appropriate sentence, the district court should consider all the applicable factors set forth in 18 U.S.C. § 3553(a). *See United States v. Gall*, 552 U.S. 38, 49-50 (2007). The listed factors in 18 U.S.C. § 3553(a) include the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence imposed. D.C. Code § 24-403.01 instructs the sentencing judge to impose a sentence that "reflects the seriousness of the offense and the criminal history of the offender; provides for just punishment and affords adequate deterrence to potential criminal conduct of the offender and others; and provides the offender with needed educational or vocational training, medical care, and other correctional treatment."

Mr. Hamilton's conduct in this case strikes at the heart of the criminal justice system. Mr. Hamilton undermined and jeopardized investigations into some of the most serious offenses in the District. He vilified brave citizens who risked their safety and reputation to come forward as witnesses in the grand jury, hoping to discourage members of the public from serving as witnesses in the future. These serious actions must have serious consequences. The government's requested sentence of 36 months incarceration provides just punishment and most importantly, provides

adequate deterrence to members of the community.

### A. Nature and Circumstances of the Offense

Even with the proliferation of technology and surveillance, violent crime investigations largely rise and fall on witness testimony. Homicide and other violent crime investigations thus often depend on citizens coming forward to testify against people in their neighborhood who know them, or even against their friends or family members. D.C. is, at heart, a small community made up of close, tight-knit neighborhoods where people tend to know each other. The labels the defendant was happily and derisively broadcasting to these small arenas—identifying individual witnesses as "hot" or "rats" or "snitches"—are some of the most dangerous slurs that can be levied on an everyday citizen. Being labelled a "rat" can have disastrous consequences, both to one's personal reputation and to one's physical safety. This unfortunate custom has a long history of chilling the public's willingness to participate in the criminal justice system. The defendant's behavior turns the act of testifying truthfully into an act of courage. Participation in the criminal justice system, providing truthful testimony, and obtaining justice for victims and their families, should not be this ridden with fear and danger. But the Mr. Hamilton's actions help make it so.

Mr. Hamilton's conduct must be seen as part of a larger, inherently dangerous pattern of fear-mongering—one that strikes at the heart of efforts to combat violent crime. Knowing that individuals like Mr. Hamilton will scorn, abuse, humiliate, and even possibly harm them, makes victims and witnesses to crime reluctant to cooperate, justifiably fearful of retribution for testifying in a court of law. As violent crime prosecutors know, it often takes numerous sessions with a victim or witness before they reach a level of comfort where they are able to overcome this fear and are willing to testify truthfully before the grand jury. In light of this, one of the greatest assurances prosecutors provide to witnesses to assuage their fears is explaining that the grand jury process is

secret. Specifically, prosecutors and victim-witness specialists explain that the grand jurors are sworn to secrecy and are prohibited under the law, and under penalty of prosecution, from telling anyone that the witness appeared. In fact, the U.S. Attorney's Office goes to great lengths to keep grand jury witnesses safe and protect their anonymity when they are not in the grand jury. Victim and witness names are redacted, along with their identifying information, so they are protected from public scrutiny during the grand jury phase of prosecution. This protection ultimately relies on the oaths and legal obligations of the grand jurors to protect the witnesses during their actual testimony. Here, the defendant proudly betrayed his oath, and violated all of his legal obligations. Thus, the system failed these witnesses.

Mr. Hamilton filmed at least 14 different grand jury investigations and at least 18 different witnesses. The investigations included shootings, armed carjackings, and numerous homicides. The witnesses included a parent testifying against a child, a person testifying against their significant other, and multiple victims of shootings and other violent offenses. He repeatedly called the witnesses rats, snitches, and hot. He broadcasted their names and testimony to potentially over 10,000 people. He did so knowing that what he was doing was illegal—all the while boasting that his actions could land him in prison for three years.

Mr. Hamilton jeopardized serious investigations. But most critically, he put individual lives at risk. Mr. Hamilton signaled to anyone who was listening that serving as a witness or cooperating with law enforcement is somehow the greater evil and a reason for demonization. The defendant's conduct is the realization of many witnesses' greatest fears and has the potential to make the prosecution of serious violent crimes only more difficult in the future. Such a serious crime warrants a serious sentence, and thus the nature and circumstances of the offense weigh heavily in favor of a significant period of incarceration.

B. **The History and Characteristics of the Defendant**

At the time this offense was committed, Mr. Hamilton was a special police officer working for the Smithsonian. As a licensed Special Police Officer, he worked as an armed security guard with police powers limited only geographically to the confines of the Smithsonian. *See* 23 D.C. Code § 582(a); *see also Maniaci v. Georgetown University*, 510 F.Supp.2d 50, 68 (D.D.C. 2007). In other words, while at work, Mr. Hamilton carried a firearm and had full authority to make arrests. That Mr. Hamilton's occupation places him in such a position of trust to uphold the law makes his conduct all the more outrageous. Mr. Hamilton is charged with upholding public safety, and yet his actions recklessly endangered dozens of witnesses and fellow grand jurors performing a public service.

C. **The Need for the Sentenced Imposed**

Seldom does a case come before the Court where the need for general deterrence is so great. The functioning of our system, the protection of witnesses, justice for victims, and the resolution of violent crime and homicide investigations depend on the continued secrecy of grand jury proceedings. Such secrecy protects the integrity of investigations, the safety of victims and witnesses, and the reputation of suspected but ultimately uncharged targets.

This moment is an important inflection point. We live in a society where nearly everyone carries a recording device on them at all times and where more and more members of an always-online, social media-obsessed generation age

into jury service every day. This case should not become a blueprint for future citizens seeking clout for their online persona. Rather, the sentence in this case must demonstrate the importance of the integrity of the grand jury and the protection of victims and witnesses. It must further demonstrate the serious consequences for those who would cavalierly shatter that integrity,

endanger innocent people, and betray the public trust.

Mr. Hamilton jeopardized serious investigations, he put people's lives at risk, and he defamed witnesses performing a vital public service. The government's requested sentence of 36 months of incarceration is necessary to serve the interests of justice in this case.

## CONCLUSION

For all these reasons, the Government recommends that the Court sentence the Defendant to 36 months of incarceration for obstruction of justice to run concurrent to 6 months incarceration for contempt.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. No. 481052


*/s/ Joshua Gold*
JOSHUA GOLD
Tx Attorney No. 24103101
Assistant United States Attorney
U.S. Attorney's Office
601 D. Street N.W.
Washington, D.C. 20530
(202) 815-8965
Joshua.Gold@usdoj.gov